# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| KIMBERLY CLINE, individually and ) <br> on behalf of her minor child, E.C., ) <br> ) <br>     **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> ) <br> **UNITED STATES,** ) <br> ) <br>     **Defendant.** ) | Civil No. 3:13-cv-776 <br> Judge Aleta A. Trauger |

## MEMORANDUM

The defendant, the United States, has filed a Motion for Summary Judgment (Docket No. 55), to which the plaintiff, Kimberly Cline, has filed a Response (Docket No. 61), and the defendant has filed a Reply (Docket No. 64). Both parties have also filed additional reply briefing. (Docket Nos. 70, 73.) For the following reasons, the defendant's Motion for Summary Judgment will be denied.

## FACTS[1]

This case stems from the tragic victimization of the plaintiff's minor child, EC, by her adoptive father, Joshua Matthew Cline ("JMC"). The plaintiff, Kimberly Cline ("KC"), proceeds individually and on behalf of EC, who was born in 2001. KC met JMC through the internet in October of 2006 and, in May of the following year, they were married. At the time, JMC was an active duty soldier with the United States Army and, shortly after the marriage, KC moved with

---

[1] Unless otherwise noted, the facts recounted in this section are drawn primarily from the defendant's Statement of Undisputed Facts (Docket No. 58) and the plaintiff's response thereto (Docket No. 61-1). Where there is a genuine dispute of fact, the court will construe the fact in the light most favorable to the plaintiff as the non-moving party.

1

her daughter to Clarksville, Tennessee to live with him. (Docket No. 57-1 (Aff. K. Cline) ¶ 12.) In October of 2007, JMC was deployed to Iraq, where he remained until March 1, 2008, when he received mid-tour leave and returned to Tennessee. (*Id.* ¶¶ 16, 18.) While at home, and without the knowledge of KC, JMC forcibly raped and sodomized EC, who was then six years old. JMC produced photographs and video of the abuse and stored the material on his computer, which he took with him when he returned to his duties in Iraq on March 19, 2008. (*See id.* ¶ 21.)

In September of 2008, the Criminal Investigative Division ("CID") at Camp Taji, Iraq – where JMC was stationed – received information that JMC had solicited access to child pornography websites on the internet and had purchased a membership to one site for $490. On September 29, 2008, the CID at Camp Taji executed a search and seizure authorization of JMC's living area, interviewed JMC, and seized his media storage devices, including the computer containing the pornographic photographs and video that he had produced of EC in March of 2008. During the interview, JMC admitted that he possessed child pornography with a preferred age range of "between 7 and 10 years old," but he denied ever sexually assaulting EC. (Docket No. 57-4 (Sworn Statement J. Cline).)

On October 3, 2008 – several days after the interview and seizure of his devices – JMC called KC to inform her that he was under investigation "for something found on his computer," which he characterized as "not a big deal" and the result of "some virus." (Docket No. 61-1 ¶¶ 9, 10, 12 (quoting Docket No. 57-1 (Aff. K. Cline) ¶¶ 25, 26).) JMC told KC that he had spoken to an attorney, who informed him that KC had spousal privilege and should not talk to anyone about the investigation. A week later, KC received a call from the CID at Fort Campbell, Kentucky regarding the investigation into JMC. During the call, and based on a discussion she had with JMC's attorney, KC invoked spousal privilege and refused to speak with investigators,

2

who did not inform her of the basis for their investigation into JMC.

On October 15, 2008, KC received a second call from the CID at Fort Campbell, informing her that she must go to Army Family Services at Fort Campbell or she "would be in trouble." (Docket No. 57-1 (Aff. K. Cline) ¶ 32.) KC traveled to Fort Campbell the next day – October 16, 2008 – and met with personnel from Army Family Services and the CID. The parties offer differing accounts of the discussion that took place during this meeting. KC contends that, during the meeting, Army personnel reviewed the CID file on its investigation into JMC and suggested that KC limit JMC's time with EC thereafter. (*Id.* ¶ 35.) KC further recalls that, when she asked during the meeting if there was any reason that she should limit JMC's time with EC, Army personnel reassured her "that the investigation had nothing to do with [EC] and not to worry." (*Id.* ¶ 36.) KC maintains that, during this meeting, she was not informed of the basis for the investigation into JMC or allowed to examine anything in the CID file on the investigation. The defendant, on the other hand, claims that, during the interview, KC insisted that EC had never been "touched" by JMC and continued to refuse to cooperate with investigators (Docket No. 56, p. 4), but this account is based on inadmissible hearsay evidence,[2] and the court must, therefore, discount it.

The parties appear to agree that this conversation did not prevent EC from being abused by her adoptive father again. On November 14, 2008, JMC returned home from Iraq, and KC limited his time with EC over the following weeks. (Docket No. 57-1 (Aff. K. Cline) ¶ 40.) On

---

[2] The defendant's account of this meeting is supported solely by a "Summary of Investigative Activity," which purports to summarize the actions taken during the CID's investigation of JMC. (Docket No. 57-5.) This summary is comprised entirely of out-of-court statements being offered for the truth of the matter asserted and, despite objections from the plaintiff, the defendant has introduced no evidence demonstrating that it, or its contents, fall within any exception to the rule against hearsay. The investigative summary is, therefore, inadmissible hearsay and will not be considered by the court.

December 6, 2008, however, EC was left alone with JMC while KC was in the hospital for the birth of her and JMC's son. While EC was alone with JMC, he again raped and sodomized her.

On January 13, 2009, a CID agent conducted a forensic examination of the media devices that had been seized from JMC in September of 2008, allegedly revealing for the first time the video of JMC abusing EC in March of 2008. At this point, the CID only *suspected* that the child in the video was EC, a suspicion that was not confirmed until later (at some unspecified time).

It appears that the discovery of this video on JMC's computer prompted the Army to finally contact the Tennessee Department of Children's Services ("DCS") and, on January 21, 2009, DCS contacted KC while she was at work to instruct her to return to her home. When KC returned home, she discovered that federal agents were searching her residence. KC was informed by Agent Jonathan Hendrix that the search was based on JMC's possession of child pornography and that a suspected image of EC was depicted in child pornography found on JMC's computer. KC was also told that JMC had been taken into custody. KC maintains that she was "devastated" by the news regarding EC and asked "why no one had told [her] anything about it earlier," but she was given no further information about the investigation or the possibility that her daughter had been abused. (Docket No. 61-1 ¶ 41 (quoting Docket No. 57-1 (Aff. K. Cline) ¶¶ 48–50).) KC attempted to contact the attorney with whom she had spoken when she first learned of the investigation into JMC in October of 2008, but the attorney said that she could do nothing for her. KC also questioned a DCS official, Malika Holmes, who interviewed her on the day of the search. Ms. Holmes told KC that she "did not know what [law enforcement had] found or if it was really [EC] or not in the picture they found," and she could not provide KC with any further information about the investigation or the possible abuse of her daughter. (Docket No. 57-1 (Aff. K. Cline) ¶ 51).) The day after the search, KC even

questioned JMC's court-appointed attorney, who interviewed her but told her that he could not reveal any details about the case against JMC. (*Id.* ¶ 56.)

On January 23, 2009, DCS asked KC to take EC to Nashville OurKids – a group that works with abused, abandoned, and neglected children – for a physical examination and interview by OurKids staff. KC communicated everything she knew about the alleged abuse to the personnel at OurKids and, after her daughter had been examined, they informed her that "they found no physical damage and stated that [EC] did not say she had been abused at all." (*Id.* ¶ 59.) Immediately after this examination, KC took EC to DCS, where KC was questioned by Detective Ginger Fleisher of the Clarksville Police Department and, later, arrested for child abuse and child endangerment. While KC was being booked into jail, Detective Fleisher told her that JMC "had been raping [EC] constantly [and] publishing videos and photos of her on the internet." (Docket No. 61-1 ¶ 49 (quoting Docket No. 57-1 (Aff. K. Cline) ¶¶ 62, 64–65).) KC remembers that, after receiving this news, she "collapsed on the floor" and was upset that "no one had warned or informed [her] early enough to protect [her] daughter." (*Id.*) Nothing in the record suggests, however, that Detective Fleischer provided KC with any additional information regarding JMC's abuse of her daughter, including the basis for Detective Fleischer's own purported knowledge that JMC had been "constantly" abusing EC. All charges against KC were eventually dropped in May of 2009, but, for a portion of the intervening time period, KC was denied access to EC and her infant son. (Docket No. 57-1 (Aff. K. Cline) ¶¶ 66–70.)

In the year following KC's arrest, EC was physically examined once more for signs of abuse, was interviewed twice more, and was treated by Dr. Janie Berryman, a trained psychologist. (*Id.* ¶ 68; Docket No. 61-2 (Decl. Dr. Berryman).) Nothing in the record indicates that any medical professional ever found signs that EC had been abused during a physical

5

examination or that EC ever revealed (to anyone, medical professional or otherwise) that she had been abused by JMC at any point in the past. Furthermore, there is no evidence in the record suggesting (1) that JMC ever revealed his abuse of EC in December of 2008 to anyone, including the government, or (2) that he produced any photographs or videos during the December 2008 abuse that would serve as independent evidence of the fact that the abuse occurred. It appears from the record before the court, therefore, that, throughout 2009 and early 2010, no one other than JMC and EC had actual knowledge of the December 2008 abuse (no matter how suspicious they may have been) and that no independent proof of this abuse existed.

Finally, on March 10, 2010, EC disclosed to KC that JMC had, in fact, abused her in the past and, specifically, that he had abused her in December of 2008, while KC was hospitalized during the birth of her younger son.[3] After this revelation, and realizing that her daughter had been abused *after* the government began its investigation into JMC in September, KC began to investigate the government's potential involvement in allowing the December 2008 abuse to occur. (Docket No. 57-1 (Aff. K. Cline) ¶ 86.) As a result of her efforts, KC alleges that she discovered that, (1) as early as September of 2008, and before JMC returned to Tennessee to

---

[3] The Motion hinges on the defendant's argument that KC's claims are time-barred because she "was aware, or, at least, through the exercise of reasonable diligence, should have been aware" of the injury to her and EC long before March of 2010. (Docket No. 56, pp. 15–16.) The defendant argues that KC was on notice of the possibility that JMC had abused EC as early as October and November of 2008, when KC repeatedly blocked the CID's efforts to schedule a forensic interview of EC by professionals at a child advocacy center. (*See id.*; Docket No. 61-1 ¶¶ 17–20.) The court will not, however, consider this argument or the evidence that supports it. First, this argument is supported solely by the "Summary of Investigative Activity," which, as discussed *supra*, is inadmissible hearsay and will not be considered by the court. Second, KC's claims arise not out of JMC's general abuse of EC throughout 2008, but specifically from JMC's abuse of EC in December of 2008, after the government was already aware of his interest in child pornography. Evidence of interactions between the CID and KC in the months *before* that abuse is, therefore, only marginally relevant to the determination of when KC was aware, or should have been aware, of the December 2008 abuse.

6

abuse EC further, the Army had video evidence of the March 2008 assault of EC, and (2) the Army did not notify appropriate federal agencies, who were already surveilling KC, of JMC's November 2008 return from Iraq. (*Id.* ¶¶ 86–93.)

On February 22, 2012, almost two years after EC first disclosed her abuse at the hands of JMC, KC filed administrative claims for herself and for EC with the Department of the Army. In the claim, she alleges that the Army "intentionally and negligently allowed [JMC] to rape his step-daughter [EC] while the [CID] had knowledge that [JMC] possessed and produced pornographic images of [EC]." (Docket No. 57-7.) KC further alleged that the CID and the Army "intentionally and negligently failed to warn [KC], [EC's] mother, of the danger and likelihood of the abuse if [JMC] was left alone with [EC]." (*Id.*) The Department of the Army sent a letter to KC's attorneys acknowledging its receipt of KC's administrative claim, but the record contains no information regarding the ultimate disposition of the claim. (*See id.*)

## **PROCEDURAL HISTORY**

KC filed this action on August 5, 2013. (Docket No. 1.) The operative complaint (the "Complaint") alleges five claims under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.* (the "FTCA"): intentional infliction of emotional distress, negligent infliction of emotional distress, negligence in the standard and duty of care, negligence *per se*, and failure to warn or report. (Docket No. 33.) Specifically, the Complaint alleges that the defendant had, and breached, "an absolute duty to contact the Tennessee DCS" under both Tennessee and federal law. (*Id.* ¶ 77 (citing Tenn. Code Ann. §§ 37-1-403, 37-1-605 (requiring law enforcement to report suspected physical or sexual abuse of a child); 42 U.S.C. § 13031(a) (requiring that law enforcement officers working on federal land report suspected child abuse upon "learn[ing] of facts that give reason to suspect that a child has suffered an incident of child abuse")).) The

defendant answered the Complaint on June 3, 2015. (Docket No. 48.)

On January 1, 2016, five months before the court-ordered deadline for dispositive motions, the defendant filed a Motion for Summary Judgment, arguing that KC's claims are time-barred by the FTCA's two-year statute of limitations. (Docket No. 55.) According to the defendant, KC knew or should have known of the existence and the cause of the injuries to her and her daughter no later than January 23, 2009, three years prior to her filing of an administrative claim with the Department of the Army. (*Id.*) The motion is accompanied by a Memorandum in support, a Statement of Undisputed Facts, and the Declaration of Major Nolan Koon, which attaches various exhibits, including an affidavit by KC, multiple investigation reports, and the administrative claim filed by KC with the Department of the Army. (Docket Nos. 56–58.) The defendant did not raise any additional grounds for summary judgment on KC's claims.

KC filed a Response in opposition to the defendant's motion on January 26, 2016, accompanied by a Response to the defendant's Statement of Undisputed Facts and the declaration of Dr. Janie Berryman, EC's treating psychologist. (Docket No. 61.) In the Response, KC argues that her cause of action did not accrue in January of 2009 but, rather, on March 10, 2010, when EC first revealed to KC that she had been abused by JMC in December of 2008 (*after* the CID investigation was already well underway). (*Id.* at p. 2.) KC's claims, which were filed less than two years after this revelation, were, therefore, timely. (*Id.*)[4]

The defendant filed a Reply on February 19, 2016, arguing primarily that KC's Response

---

[4] KC also contends that, should the court find that her claims accrued in January of 2009, she is entitled to equitable tolling of the two-year limitations period because EC did not disclose the December 2008 abuse until March of 2010. (Docket No. 61, pp. 17–19.) The court need not reach the question of equitable tolling, however, because – as discussed *infra* – KC's claims did not accrue until March of 2010.

8

to the Statement of Undisputed Facts is inadequate and that all of the defendant's purportedly undisputed facts should, therefore, be deemed admitted pursuant to Federal Rule of Civil Procedure 56(e). (Docket No. 64.) KC and the defendant both filed additional reply briefing – with leave of the court – on March 11 and March 21, 2016, respectively. (Docket Nos. 70, 73.) KC requested leave to file an *additional* sur-reply on March 24, 2016, but the court denied the request. (Docket Nos. 74, 75.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*,

578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

The FTCA provides a waiver of sovereign immunity that allows the United States to be sued "in the same manner and to the same extent as a private individual under like circumstances" for a tort claim arising from the acts of federal employees acting within the scope of their employment. 28 U.S.C. § 2674; *see Young v. United States*, 71 F.3d 1238, 1241 (6th Cir. 1995). The FTCA bars a tort claim against the United States unless first presented to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). The purpose of this limitations period is to "require the reasonably diligent presentation of tort claims against the Government." *United States v. Kubrick*, 444 U.S. 111, 124 (1979).

The Supreme Court has ruled that a tort claim accrues under § 2401(b) of the FTCA when the plaintiff "knows both the existence and the cause of his injury." *Kubrick*, 444 U.S. at 113.[5] Accrual of the claim does not "await awareness by the plaintiff that his injury was negligently inflicted" but, rather, occurs when a plaintiff, "armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community." *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009) (quoting *Kubrick*, 444 U.S. at 123). The FTCA's limitations period thus does not begin to run until the plaintiff has discovered or, in the exercise of reasonable diligence, should have discovered the critical facts regarding his injury and its cause. *Id.* (citing *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)); *Ruff v. Runyon*, 258 F.3d 498, 500–01 (6th Cir. 2001); *Coffie v. United States*, 43 F. App'x 808, 811

---

[5] Generally, a plaintiff's claim under the FTCA "accrues at the time of injury," but, in cases involving claims of negligence, courts have consistently applied the *Kubrick* standard, by which the claim does not accrue until the plaintiff "has discovered both his injury and its cause." 444 U.S. at 120; *accord Chomic v. United States*, 377 F.3d 607, 610–11 (6th Cir. 2004).

(6th Cir. 2002). The determination as to when a plaintiff has such knowledge is, as the Sixth Circuit has oft noted, "necessarily fact-intensive," and courts generally consider when a "reasonable person" would have been aware of information sufficient to trigger accrual of the claim. *Amburgey v. United States*, 733 F.3d 633, 637–39 (6th Cir. 2013) (quoting *Hertz*, 560 F.3d at 619).

KC's claims against the government are based on the government's alleged failure – after the CID's interview of JMC in which he admitted to possessing child pornography and seizure of the computer containing the pornographic video of EC – to take action against JMC or to contact law enforcement in Tennessee, DCS, or any other authority. (Docket No. 33.) As a result of this failure, KC maintains that JMC was allowed to return to Tennessee in November of 2008 and further abuse EC in December of 2008. (*Id.*) The critical question with respect to the accrual of these claims, therefore, is whether KC knew or should have discovered the critical facts regarding the December 2008 abuse before March 10, 2010, when her daughter first disclosed it to her.[6]

KC does not dispute that, by January 23, 2009, she was aware of the *possibility* that JMC had abused EC in the past. Specifically, KC acknowledges that (1) Agent Hendrix told her on January 21, 2009 that a suspected image of EC was depicted in the child pornography recovered

---

[6] Despite the fact that KC has brought claims against the government on her own behalf and on behalf of EC, the court considers only *KC's* knowledge for purposes of determining when the claims accrued. First, the government has not argued that accrual of the claims in this case could in any way be triggered by EC's knowledge of her own abuse in December of 2008. Second, for purposes of the FTCA's statute of limitations, the parent's knowledge of the minor's injuries is generally imputed to the minor, *see MacMillan v. United States*, 46 F.3d 377, 381 (5th Cir. 1995), but the court is aware of no precedent holding that a minor child's knowledge should be imputed to the parent. In fact, such a holding would seem manifestly unfair, as a minor child may not institute proceedings on her own behalf to protect her legal rights but, rather, must rely on her parents (and their knowledge) to do it for her.

on JMC's digital media, and (2) Detective Fleischer told her on January 23, 2009 that JMC "had been raping [EC] constantly [and] publishing videos and photos of her on the internet." (Docket No. 61-1 ¶¶ 40, 48.)

While these statements certainly placed KC on notice of the possibility of JMC's having abused EC in the past, they are not sufficient to have armed KC, or a reasonable person in her place, with enough information about the specific harm done to her and her daughter to trigger the beginning of the FTCA's two-year limitations period. First, KC was told only that the authorities "suspected" that EC's image was found in the pornographic material on JMC's computer. Although EC's presence in the pornographic material was later confirmed, the government has introduced no evidence identifying when that confirmation took place or, consequently, when EC could have been made aware of that confirmation. Second, Detective Fleischer may have told KC that JMC had been abusing EC, but nothing in the record suggests that she provided KC with any additional information regarding the abuse, such as when it had occurred or why Detective Fleischer believed the abuse to have been "constant[]." These vague statements do nothing more than inform KC of investigators' unverified suspicions of abuse at some unspecified point in the past. They do not provide KC with sufficient "critical facts" regarding the abuse of EC in December of 2008 – after the defendant had reason to know of JMC's predilection for child pornography – to allow KC to procure informed legal advice with respect to the claims at issue in this action and, thereby, effectively protect her legal rights. *See Amburgey*, 733 F.3d at 637.[7]

---

[7] It should go without saying that it would be prohibitively difficult for KC, or any lawyer with whom she spoke, to effectively pursue a claim that is entirely premised on EC having been abused *after* September of 2008 without evidence that any abuse took place during that time period and in contradiction to EC's repeated denials that nothing inappropriate had occurred.

12

Furthermore, even if the court were to assume that these two statements would have caused a reasonable person to suspect that EC was abused *after* the CID's investigation had already begun, the government has introduced no evidence demonstrating that any amount of reasonable diligence on KC's part, prior to March of 2010, could have confirmed that suspicion. *See Hertz*, 560 F.3d at 618 (noting that the touchstone of FTCA claim accrual analysis is "when a plaintiff possesses enough information with respect to her injury that, '[h]ad [she] sought out independent legal and [expert] advice at that point, [she] should have been able to determine in the two-year period whether to file an administrative claim" (quoting *McIntyre v. United States*, 367 F.3d 38, 53 (1st Cir. 2004))). The government has introduced nothing demonstrating that it, or anyone else, had any evidence suggesting that JMC had abused EC at any point after March of 2008. Moreover, the government has failed to rebut any of KC's evidence that (1) the physical examination of EC at OurKids in Nashville revealed no signs of abuse, and (2) prior to March 10, 2010, EC repeatedly denied – to both medical professionals and to KC herself – that she had ever been abused by JMC. The government has also failed to produce any evidence suggesting that JMC himself ever disclosed the December 2008 abuse to anyone, let alone to KC.

With no independent evidence of the December 2008 abuse, and with no indication that JMC disclosed that abuse to anyone, the only evidence of the abuse is EC's own disclosure to her mother on March 10, 2010. That is the first day that KC was armed with sufficient, critical information regarding the wrong done to both her and her daughter, not just by JMC, but also – potentially – by a government that may have been able to protect EC in December of 2008, but failed to do so. KC's claims, therefore, accrued on March 10, 2010, and they were timely presented to the Department of Army in compliance with the two-year limitations period of the FTCA. Accordingly, the defendant's motion will be denied, and KC's claims will be allowed to

proceed.

## **CONCLUSION**

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge